UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLERGIA, INC., a California corporation, | Case No.: 14-CV-1566 JLS (RBB) |
| Plaintiff, | **ORDER ON MOTIONS FOR SUMMARY JUDGMENT** |
| v. | |
| DENIS BOUBOULIS, an individual; and DOES 1 THROUGH 5, inclusive, | (ECF Nos. 77, 80) |
| Defendants. | |

Presently before the Court is Plaintiff Allergia, Inc.'s Motion for Summary Judgment of Estoppel Regarding Ownership of Certain Patent Applications, ("Pl.'s MSJ," ECF No. 77), as well as Defendant Denis Bouboulis's Response in Opposition to, ("Pl.'s MSJ Opp'n," ECF No. 91), and Plaintiff's Reply in Support of, ("Pl.'s MSJ Reply," ECF No. 107), Plaintiff's MSJ. Also before the Court is Defendant's Motion for Partial Summary Judgment, ("Def.'s MSJ," ECF No. 80), as well as Plaintiff's Response in Opposition to, ("Def.'s MSJ Opp'n," ECF No. 97), and Defendant's Reply in Support of, ("Def.'s MSJ Reply," ECF No. 100), Defendant's MSJ. After considering the parties' arguments and the law, the Court rules as follows.

/ / /

/ / /

# BACKGROUND

Defendant Bouboulis is a medical doctor specializing in allergy and immunology. (Pl.'s Statement of Undisputed Facts ("Pl.'s SOF") ¶ 3, ECF No. 86-1.[1]) Plaintiff Allergia's predecessor was a company called CLRS, Inc. ("CLRS"). (*Id.* ¶ 1.) CLRS initially developed and sold an acne treatment device called CLARO, which used light to treat acne. (*Id.* ¶ 2.) In 2006, Defendant was asked and agreed to become an advisor to CLRS. (*Id.* ¶ 8.) CLRS did not pay Defendant a salary, but in January and June 2007 CLRS gave Defendant a total of 116,111 shares in CLRS for his efforts. (*Id.* ¶ 9.)

Around November 2007, Defendant communicated an idea to the CEO of CLRS, Richard Oberreiter. (*Id.* ¶ 16.) Defendant's idea was to use the CLARO light treatment technology to treat seasonal allergies (the "Allergy Device"). (*Id.* ¶¶ 16, 17.) The Allergy Device concept included modifying an existing CLRS CLARO device by putting a fiber-optic piece onto the end of the CLARO device to transmit the CLARO's light into a patient's nasal cavity. (*Id.* ¶ 20.) Oberreiter responded with interest and told Defendant that this idea "may be very important" for the financial future of CLRS. (*Id.* ¶ 18.) Oberreiter also suggested that if the Allergy Device was promising, he wanted to apply for patent protection. (*Id.* ¶ 19.) In April 2008 Oberreiter retained a patent attorney on behalf of CLRS to assist in applying for patent protection. (*Id.* ¶ 24.) Among other things, Defendant helped with the patent application by reviewing prior art and preparing an FDA proposal for the Allergy Device. (*Id.* ¶¶ 25, 26.)

In October 2008 Defendant asked Oberreiter for compensation from CLRS for the work he had done and would continue to do for CLRS. (*Id.* ¶ 27.) Oberreiter sent Defendant a proposed royalty agreement which, among other things, stated that as between CLRS and Defendant "all patent rights, copyrights, trade secrets, trademarks and other proprietary rights concerning the [allergy technology] would remain the exclusive property of CLRS,

---

[1] A majority of these background facts are taken from Plaintiff's SOF. The Court later draws all reasonable inferences from the evidence in favor of the non-moving party when assessing each party's respective motion for summary judgment.

14-CV-1566 JLS (RBB)

and [Defendant] will not acquire any rights therein except [f]or the limited right to any use specified in" the proposed agreement. (*Id.* ¶ 30.) Despite some discussion between the parties, Defendant never signed the royalty agreement. (*Id.* ¶ 33.) Nevertheless, Defendant continued to help develop the allergy technology. (*Id.*)

Around early 2010 Oberreiter told Defendant that CLRS was experiencing financial difficulties and that CLRS was negotiating to be acquired by a third-party company, Solta Medical ("Solta"). (*Id.* ¶ 35.) Defendant suggested spinning off the allergy technology into a separate company so that the Allergy Device and related intellectual property would not be acquired by Solta, and so that the team could continue to develop and market the device. (*Id.*) Near the end of June 2010, Oberreiter told Defendant that negotiations with Solta would soon begin and that he wanted to get the provisional patent application filed for the Allergy Device so that those patent rights could be more clearly carved out of the Solta merger. (*Id.* ¶ 38.)

On August 5, 2010, CLRS filed U.S. Provisional Application Serial No. 61/371,172 (the first of the Allergia patent applications covering the Allergy Device). (*Id.* ¶ 42.) The application named three inventors: Defendant, Oberreiter, and Jan Enemaerke. (*Id.*) On June 30, 2010, CLRS's patent attorney sent Defendant and the other two inventors several documents relating to the patent application, including an assignment document. (*Id.* ¶ 41.) On July 8, 2010, August 3, 2010, September 30, 2010, and October 1, 2010, Oberreiter again sent the assignment document to Defendant, but Defendant did not execute that assignment document. (*Id.*) At some point after those five attempts, Defendant called Oberreiter and Oberreiter again encouraged Defendant to sign the assignment documents, but to no avail. (*Id.*)

Before the merger with Solta, CLRS created a spin-off company, Plaintiff Allergia, Inc., to further develop the allergy-treatment technology and business. (*Id.* ¶ 44.) Defendant and the other CLRS shareholders were made shareholders in Allergia with the same number of shares they held in CLRS. (*Id.* ¶ 45.) On October 5, 2010, Defendant asked for additional ownership equity in the new company and "made clear to [Oberreiter] that

Defendant was not going to sign the patent assignment documents . . . ." (*Id.* ¶ 45.) Nevertheless, sometime around October 12, 2010 Oberreiter asked Defendant to serve as Allergia's interim president. (*Id.* ¶ 48.) The board agreed and elected Defendant interim president of Allergia.

To formally transfer the Allergy Device patent application and related technology and rights from CLRS to the newly formed Allergia, two documents were prepared: (1) an "Assignment and Assumption Agreement" and (2) a "License Agreement" (together, the "CLRS Assignment Agreements"). (*Id.* ¶ 49.) On October 12, 2010, Defendant reviewed and signed these documents in his capacity as president of Allergia. (*Id.* ¶ 50.) Among other things, the documents included the statement that CLRS owned all of the Allergia Patents.[2] (*Id.* ¶ 53.)

Defendant continued to serve as interim president, wherein he further developed the allergy technology through work with FDA consultants and attorneys to market the product. (*Id.* ¶ 55.) Allergia did not compensate Defendant while he served as its president. (*Id.* ¶ 56.) Defendant scheduled a conference call with the other directors of Allergia for December 18, 2010. (*Id.* ¶ 57.) During that call, Defendant expressed concerns about the financial viability of the company, and proposed that, in exchange for majority ownership of the company, he would invest his own money in the company's efforts in order to further develop the Allergy Device. (*Id.* ¶ 59.) The other directors responded with silence. (*Id.*

---

[2] Plaintiff defines the Allergia Patents as follows:

1. United States Provisional Patent Application Ser. No. 61/371,172 (the "'172 application"), filed on or about August 5, 2010;
2. United States Utility Patent Application Ser. No. 13/198,672 (the "'672 application"), filed on or about August 4, 2011, filed based on Allergia's aforementioned '172 application;
3. United States Utility Patent Application Ser. No. 14/223,861 (the "'861 application"), filed on or about March 24, 2014, filed based on Allergia's aforementioned '172 and '672 applications; and/or
4. any and all continuation, continuation-in-part, divisional, reissue, or other applications related to and/or based on the '172, '672, and/or '861 applications.

(Pl.'s MSJ Mem. 6–7, ECF No. 86.)

¶ 60.) On January 23, 2011, director Lawrence Johnson wrote to Defendant and told him that Allergia had been restructured and that Defendant was no longer its president; instead, he had been made its chief medical officer. (*Id.* ¶ 63.) But after some discussion, on February 9, 2011, Richard Clement, a director and officer of Allergia, emailed Defendant, "on behalf of the shareholders and the other prospective members of the board of directors" that Allergia would "be proceeding without" Defendant and asked him to return "all of the corporate documents belonging to the company." (Def.'s Statement of Undisputed Facts ("Def.'s SOF") ¶ 88, ECF No. 87-1.)

Allergia prepared materials for a second related patent filing, including a formal assignment to reflect that the three inventors had assigned their rights to Allergia. (Pl.'s SOF ¶ 65.) Defendant refused to sign the formal assignment document. (*Id.*) In addition, Defendant retained his own patent attorney to prepare a separate handheld allergy technology patent application, naming only Defendant as an inventor. (*Id.*) Defendant filed that separate application on August 5, 2011, around the same time Allergia filed its second patent application. (*Id.*) Defendant's refusal to sign assignment agreements has precluded Plaintiff from pursuing certain business opportunities. (*Id.* ¶ 66.)

Plaintiff brings three claims against Defendant for: (1) declaratory judgment of patent application ownership and/or other patent and intellectual property rights; (2) breaches of fiduciary duty and/or implied contract; and (3) fraud. (*See* Second Am. Compl. ("SAC"), ECF No. 53.) Defendant brings several counterclaims against Plaintiff for: (1) declaratory judgment of patent application ownership; (2) breach of contract; (3) breach of implied contract; (4) failure to pay minimum wage in violation of the California Labor Code; (5) promissory estoppel; (6) fraud; and (7) quantum meruit. (*See* Def.'s Answer to SAC ("Answer"), ECF No. 57.)

The parties now move for summary judgment on several of these claims and counterclaims.

/ / /

/ / /

14-CV-1566 JLS (RBB)

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56(a), a party may move for summary judgment as to a claim or defense or part of a claim or defense. Summary judgment is appropriate where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. The moving party may meet this burden by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that show an absence of dispute regarding a material fact. *Id.* When a party seeks summary judgment as to an element for which it bears the burden of proof, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial. *Celotex*, 477 U.S. at 324. This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248. The non-

14-CV-1566 JLS (RBB)

moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256.

## ANALYSIS

### I.    Plaintiff's Motion for Summary Judgment on Estoppel

Plaintiff moves for summary judgment that Defendant is estopped from denying that Allergia owns all rights and interest in the Allergia Patents, and, consequently, Defendant has no claim to ownership or other rights or interest in the Allergia Patents (except through its ownership of shares in Allergia). (Pl.'s MSJ Mem. 5,[3] ECF No. 86.) Defendant argues that Plaintiff's MSJ on promissory estoppel is (1) barred because this is the first time Plaintiff has raised the issue (i.e., the claim does not appear in its pleadings), (2) even if it is not barred, Plaintiff's claim fails because of its unclean hands, and (3) Plaintiff fails to satisfy the elements of promissory estoppel. (*See generally* Pl.'s MSJ Opp'n, ECF No. 92.)

The Court agrees with Defendant's first and third arguments.[4] First, Plaintiff has not pled a claim for promissory estoppel in the operative complaint, which explicitly lists claims for (1) declaratory judgment of patent application ownership and/or other patent rights; (2) breach of fiduciary duty and/or implied contract; and (3) fraud. (*See* SAC.) Nor does a claim for promissory estoppel appear in any other earlier Complaint. (*See* ECF Nos. 1, 30.) In its reply brief, Plaintiff argues that it properly pled its promissory estoppel claim because it included the term "estopped" when describing its fraud cause of action and in its prayer for relief. (Pl.'s MSJ Reply 10–11, ECF No. 107.) Thus, Plaintiff argues that it gave Defendant fair notice of its promissory estoppel claim under the liberal "notice pleading" of the Federal Rules. (*Id.* at 11 (citing *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993)).)

_____

[3] Pin citations to docketed material refer to the CM/ECF numbers electronically stamped at the top of each page.

[4] Thus the Court need not reach Defendant's argument that Plaintiff's promissory estoppel claim is barred by its unclean hands.

7

The Court disagrees. Plaintiff had several opportunities to amend its complaint to include a claim for promissory estoppel. It did not. Instead, it chose to assert this claim for the first time in its motion for summary judgment.[5]  While the term "estopped" does appear in its SAC, Plaintiff uses that term in the context of its <u>fraud</u> cause of action. This does not give Defendant fair notice that Plaintiff is asserting a separate cause of action for estoppel, much less the more specific cause of action for promissory estoppel. And Plaintiff has demonstrated its ability to assert distinct causes of action as evidenced by the three causes of action it explicitly pleaded in its SAC. (*See generally* SAC.) Thus, Plaintiff's promissory estoppel claim is not properly before the Court. *See, e.g.*, *Stallcop v. Kaiser Found. Hosps.*, 820 F.2d 1044, 1050 n.5 (9th Cir. 1987) ("Stallcop alleges that Kaiser, the Union, and the NLRB violated her due process rights by not notifying her about the statute of limitations. She raised this claim in the district court in her response to Kaiser's motion for summary judgment, but never raised it as a cause of action. Therefore, it is inappropriate for us to consider this claim."); *Burrell v. Cty. of Santa Clara*, No. 11-CV-04569-LHK, 2013 WL 2156374, at *11 (N.D. Cal. May 17, 2013) ("Plaintiffs' Opposition to the Motion for Summary Judgment alleges numerous facts and causes of action that were not included in the Amended Complaint. The Court will not consider claims raised for the first time at summary judgment which Plaintiffs did not raise in their pleadings." (citing, e.g., *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (noting that plaintiff could not raise new factual allegations at summary judgment because allegations not included in the complaint failed to "give the defendant fair notice of what the plaintiff's claim[s] [were] and the grounds upon which [they] rest[ed]," as required by Rule 8(a)(2) of the Federal

/ / /

---

[5] For this reason the Court **DENIES** Plaintiff's alternative request to allow it to amend its SAC to plead a promissory estoppel cause of action. (Pl.'s MSJ Reply 11.) As Plaintiff acknowledges, Federal Rule of Civil Procedure 15(a)(2) permits a party to amend its complaint, with the Court's leave, "when justice so requires." Here, justice requires the opposite. The Court will not allow Plaintiff to sandbag Defendant with a new cause of action at the summary judgment stage.

Rules of Civil Procedure))). Accordingly, the Court **DENIES** Plaintiff's Motion for Summary Judgment on this ground alone.[6]

Even if Plaintiff's claim were not barred by its failure to raise the claim in its pleadings, Plaintiff fails to satisfy the required elements of promissory estoppel. Promissory estoppel will bind a promisor "'when he should reasonably expect a substantial change of position, either by act or forbearance, in reliance on his promise, if injustice can be avoided only by its enforcement.'" *Raedeke v. Gibraltar Sav. & Loan Ass'n*, 10 Cal. 3d 665, 672 n.1 (1974) (quoting *Youngman v. Nev. Irrigation Dist.*, 70 Cal. 2d 240, 249 (1969)). "Cases have characterized promissory estoppel claims as being basically the same as contract actions, but only missing the consideration element . . . ." *US Ecology, Inc. v. California*, 129 Cal. App. 4th 887, 903 (2005). Courts have broken down this doctrine into four elements: "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." *Aceves v. U.S. Bank, N.A.*, 192 Cal. App. 4th 218, 225 (2011), *as modified* (Feb. 9, 2011) (internal quotation marks omitted).

---

[6] Remarkably, in its reply brief, Plaintiff argues that "[a]lthough Allergia's original brief focused on 'promissory' estoppel, the Court should also hold Defendant equitably estopped from denying Allergia's ownership of the relevant patent applications and technology rights." (Pl.'s MSJ Reply 12; *id.* at 12–14 (listing and arguing the elements of equitable estoppel).) The Court will hold no such thing. Like Plaintiff's promissory estoppel claim, this claim appears nowhere in Plaintiff's SAC and was raised for the first time on summary judgment. But unlike its promissory estoppel claim, Plaintiff raises its equitable estoppel claim and argument for the first time in its reply brief in support of its Motion for Summary Judgment. This is even more prejudicial to Defendant because he had no opportunity to address this new claim.

To be sure, after the hearing on the motions for summary judgment Plaintiff submitted an ex-parte request for the Court to consider equitable estoppel, and in return offered Defendant ten pages of rebuttal briefing on the topic, because Plaintiff's counsel unintentionally discussed promissory versus equitable estoppel in Plaintiff's opening brief. (*See generally* Pl.'s Post-Argument Ex Parte Stip. Re Pl.'s MSJ, ECF No. 110.) But aside from being untimely and prejudicial to Defendant, who opposes the request, (*See* ECF No. 111), Plaintiff's request does not even address the fundamental problem that it failed to plead an estoppel cause of action in its operative Complaint. Accordingly, the Court **DENIES** Plaintiff's ex parte request and **DENIES** Plaintiff's Motion for Summary Judgment alternatively based on equitable estoppel. Thus, the Court **DENIES AS MOOT** Defendant's Motion to Strike Plaintiff's ex parte request (ECF No. 111).

Plaintiff's promissory estoppel claim fails at the very start because it provides no evidence of a "clear and unambiguous promise." In California, "[a] promise is an indispensable element of the doctrine of promissory estoppel." *Id.* at 226 (citing *Garcia v. World Savings, FSB*, 183 Cal. App. 4th 1031, 1044 (2010)). The cases discussing promissory estoppel "are uniform in holding that this doctrine cannot be invoked and must be held inapplicable in the absence of a showing that a promise had been made upon which the complaining party relied to his prejudice." *Id.* Additionally, the promise must be "clear and unambiguous in its terms," *id.*, which means "definite enough that a court can determine the scope of the duty[,] and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages," *id.* Thus it "follows that if extrinsic evidence is needed to interpret a promise, then obviously the promise is not clear and unambiguous." *Garcia*, 183 Cal. App. 4th at 1045.

Plaintiff provides a list of fifteen events that purportedly constitute Defendant's "clear and unambiguous promise" that Plaintiff owned the Allergia Patents. (Pl.'s MSJ Mem. 14–16.) Specifically, this list recounts instances where Defendant failed to "[tell] anyone that he thought he owned any rights in the allergy technology." (*Id.* at 14–15.) Notably missing, however, is any evidence that Defendant actually promised Plaintiff that it owned the Allergia Patents. To be sure, a party's conduct might in some cases support a claim for promissory estoppel. *See, e.g.*, *Garcia*, 183 Cal. App. 4th at 1041 ("'The vital principle is that he who by his language <u>or conduct</u> leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted.'" (emphasis added) (quoting *Wilson v. Bailey*, 8 Cal. 2d 416, 423 (1937))). But none of these events demonstrate conduct evincing a "clear and unambiguous promise" that Defendant believed Plaintiff owned the Allergia Patents, or even a promise to cede ownership of his patent rights to Plaintiff at a later date. To the contrary, Plaintiff's cited evidence undermines its position because it describes at least two

/ / /

/ / /

instances wherein Defendant <u>declined</u> to assign his patent rights to Plaintiff.[7] (*See* Pl.'s MSJ Mem. 12, ¶¶ 8–10 (noting that Defendant did not sign a royalty agreement that would have given him royalties on sales of the Allergia Device in exchange for his acknowledgement that all patent rights would remain the exclusive property of CLRS); *id.* ¶ 11 ("Defendant refused to sign a formal assignment document for filing with the U.S. Patent Office.").) Because Plaintiff fails to establish the existence of a "clear and unambiguous promise," the burden does not shift to Defendant to refute Plaintiff's evidence.[8] Accordingly, for this and the other reasons stated above, the Court **DENIES** Plaintiff's Motion for Summary Judgment on promissory estoppel.

## II.   Defendant's Motion for Summary Judgment

Defendant moves for summary judgment on a number of claims. Specifically, Defendant argues that he is entitled to summary judgment on (A) all of Plaintiff's claims because of its unclean hands; (B) Plaintiff's declaratory judgment claim that it is the sole owner of the Allergy Device; (C) Plaintiff's breach of fiduciary duty claim; (D) Plaintiff's implied contract claim; (E) Plaintiff's fraud claim; and (F) his own counterclaims for (1) unjust enrichment, (2) quantum meruit, and (3) violations of the California labor laws. (*See generally* Def.'s MSJ Mem., ECF No. 87.) The Court considers each in turn.

### A. Unclean Hands

As a threshold matter, Defendant argues that he is entitled to summary judgment on all of Plaintiff's claims because of Plaintiff's unclean hands. "Generally, the equitable doctrine of unclean hands applies when a plaintiff has acted unconscionably, in bad faith, or inequitably in the matter in which the plaintiff seeks relief." *Salas v. Sierra Chem. Co.*, 59 Cal. 4th 407, 432 (2014). "'The misconduct which brings the clean hands doctrine into operation must relate directly to the transaction concerning which the complaint is made,

---

[7] These "events," and others, are discussed in more detail below, *supra* Section II.D, when assessing Defendant's Motion for Summary Judgment on Plaintiff's breach of implied contract claim.

[8] For this reason the Court need not consider the additional elements of a claim for promissory estoppel.

14-CV-1566 JLS (RBB)

i.e., it must pertain to the very subject matter involved and affect the equitable relations between the litigants.'" *Id.* (citing *Camp v. Jeffer, Mangels, Butler & Marmaro*, 35 Cal. App. 4th 620, 638–39 (1995)). "If the required showing is made, unclean hands may be a complete defense to legal as well as equitable causes of action." *Id.* (citing *Mendoza v. Ruesga*, 169 Cal. App. 4th 270, 279 (2008)).

Defendant argues that Plaintiff's "complete failure to pay Dr. Bouboulis even one penny for his work renders Allergia's hands unclean," thus barring all of Plaintiff's claims against Defendant. (Def.'s MSJ Mem. 15.) As President, Defendant "organized the first meeting of Allergia's board of directors (taking place on December 18, 2010), met with the prospective FDA consultant, handled administrative actions such as hiring an accountant and set up a corporate bank account, developed an FDA study protocol, and created a detailed action plan for moving forward with clinical trials of the Allergy Device." (*Id.* at 16.)

The Court disagrees that the doctrine of unclean hands bars Plaintiff's causes of action. Drawing all reasonable inferences in Plaintiff's favor, Defendant has not demonstrated that Plaintiff's failure to pay Defendant for his work as Allergia president was inequitable or otherwise done in bad faith. As Plaintiff explains, Defendant can point to no evidence that Defendant ever asked for a salary or other compensation while serving as Allergia's president. (Pl.'s MSJ Reply 7.) Nor did Defendant ask for compensation for his services in the months after being "ousted" by Allergia. (*Id.* at 8.) This is especially telling given that after being removed as president Defendant twice communicated with Plaintiff, through an attorney, advising Plaintiff that he retained some ownership rights in the Allergy Device and underlying intellectual property, but never once mentioning compensation. (*Id.* (citing Johnson Suppl. Decl. ¶¶ 12–14, ECF No. 102-2).) To be sure, while serving as Allergia president, Defendant eventually asked the board of directors for a larger ownership in the company. But even Defendant admits that this request was "in exchange for the efforts he would have to expend" on future work for Allergia. (Def.'s MSJ Mem. 12; *see also* Johnson Suppl. Decl. ¶ 8 (citing Defendant's proposed

compensation plan, sent to the board, for the "financial investment and financial risk involved <u>in furthering to develop</u> the Allergia apparatus through FDA approval" (emphasis added)).) Additionally, even if Defendant's request was meant to compensate him for his previous work, Defendant does not demonstrate that the board's rejection of his proposal was unreasonable, much less inequitable or otherwise done in bad faith. To the contrary, the board arguably reasonably rejected Defendant's proposal since at least two board members "were still reeling from their losses of hundreds of thousands of dollars on CLRS and the Claro device" and "did not want to give up substantial equity to [Defendant], who had not held any significant investments in CLRS." (Def.'s MSJ Mem. 12 (citing Def.'s SOF ¶¶ 82, 83).) And Defendant presents no authority suggesting that a board's refusal to grant an officer greater ownership of the company, reasonable or otherwise, would thereafter bar the company from bringing suit against that officer under the doctrine of unclean hands.

Furthermore, it does not appear that Plaintiff's failure to pay Defendant for his services as president is directly related to the core of Plaintiff's claims—which is to determine who owns the intellectual property underlying the Allergy Device. Plaintiff believed that Defendant had already assigned his rights in the Allergy Device and related intellectual property to CLRS when, among other things, Defendant (1) served as a CLRS consultant and (2) signed the CLRS Assignment Agreements as Allergia's president, both of which occurred before Plaintiff had any alleged duty to pay Defendant for his work as its president. (*See* Def.'s MSJ Opp'n 14–15 (citing, e.g., Oberreiter's testimony that he remembers Defendant signing a consulting agreement with a patent assignment clause); *see also* Pl.'s MSJ Reply 8 (collecting evidence)).) While much of this evidence is insufficient to demonstrate that Defendant actually assigned or promised to assign his rights to Plaintiff or another entity, *see infra* Sections II.B, D, it is sufficient to evince Plaintiff's *belief* that Defendant had already assigned his rights in the technology for purposes of Defendant's defense of unclean hands at the summary judgment stage. Accordingly, the Court **DENIES** Defendant's Motion for Summary Judgment that

14-CV-1566 JLS (RBB)

1   Plaintiff's claims are barred under the doctrine of unclean hands.

2   **B. Declaratory Judgment**

3   Plaintiff seeks declaratory judgment that it "is the owner of 100% of Plaintiff's '172
4   and '672 patent applications, and the technology and inventions underlying and disclosed
5   therein. Other than by virtue of any ownership that Defendant may have in the stock of
6   Allergia, Defendant does not own any of those patent applications." (SAC ¶ 46.) Defendant
7   argues that he is entitled to summary judgment on Plaintiff's declaratory judgment claim
8   that it is the sole owner of the Allergy Device and its related intellectual property. (Def.'s
9   MSJ Mem. 17–23.) Specifically, Defendant argues that Plaintiff has failed to produce a
10  written, executed assignment agreement in which Defendant relinquished his rights in the
11  Allergy Device or its related intellectual property to either CLRS or Allergia. (*Id.* at 18.)
12  Thus, Defendant argues that he remains a partial owner of the intellectual property
13  consistent with his status as a listed inventor. (*Id.*)

14  The Court agrees with Defendant. To begin, it is undisputed that Defendant is one
15  of the three listed inventors of the patents underlying the Allergy Device. Consequently,
16  Defendant is a one-third owner of those patents absent an assignment agreement. *See, e.g.*,
17  *SiRF Tech, Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1327 n.5 (Fed. Cir. 2010) ("'The
18  inventor is presumed to be the owner of a patent application, and [any] patent that may
19  issue therefrom, unless there is an assignment.'" (quoting 37 C.F.R. § 3.73(a))); *GE Elec.
20  Co. v. Wilkins*, No. 1:10-CV-00674 LJO, 2012 WL 4747211, at *3 (E.D. Cal. Oct. 4, 2012)
21  ("It is a basic tenant in patent law that 'the rights in an invention belong to the inventor.'"
22  (quoting *Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys.*, 131 S.
23  Ct. 2188, 2192 (2011))).

24  An assignment of patent rights must be in writing. 35 U.S.C. § 261 ("Applications
25  for patent, patents, or any interest therein, shall be assignable in law <u>by an instrument in</u>
26  <u>writing</u>." (emphasis added)); *United States v. Solomon*, 825 F.2d 1292, 1296 (9th Cir. 1987)
27  ("A patent is a creature of federal statute and may be transferred only according to the
28  terms of the patent statutes. The rules governing the transfer and assignment of patent rights

clearly envision a scheme of written assignment by providing that patents 'shall be assignable in law by an instrument in writing.'" (quoting 35 U.S.C. § 261)). While "no particular form of words is required, the instrument of transfer must be unambiguous and show a clear and unmistakable intent to part with the patent; it must express intention to transfer ownership." *Solomon*, 825 F.2d at 1296 (quoting 5 Ernest Bainbridge Lipscomb, *Lipscomb's Walker on Patents*, Title § 19:7 (3d ed. 1986)).

Plaintiff has not produced any writing executed by Defendant assigning his patent rights to Plaintiff. Rather, Plaintiff offers circumstantial evidence that it argues raises genuine issues of material fact that a written assignment does exist, thus precluding summary judgment on this point. (Def.'s MSJ Opp'n 14–15.) Specifically, Plaintiff relies on Oberreiter's testimony that Defendant signed a "consulting agreement" with CLRS when he became a medical advisor to that entity in 2007. (*Id.* (citing Def.'s SOF ¶ 43).) Oberreiter testified that the agreement "had a provision in it that [stated] his consulting work [would be performed] as a work for hire . . . [and] assigned all rights including intellectual property rights, to CLRS." (*Id.* (citing Def.'s SOF ¶ 44).) Dr. Richard Clement, the majority investor in CLRS and then Allergia, testified that he was also aware of this written consulting agreement, (*id.* (citing Def.'s SOF ¶ 51); *see also* Clement Suppl. Decl. ¶ 17, ECF No. 96-2), and that Defendant's agreement was the same as an employment agreement signed by co-inventor Enemaerke, (Def.'s MSJ Opp'n 15 (citing Def.'s SOF ¶ 55)).

This evidence fails for a number of reasons. First, and most importantly, both Plaintiff and Oberreiter have admitted that they do not have this consulting agreement and cannot provide it. The best evidence rule requires that "in proving the terms of a writing, where the terms are material, the original writing must be produced unless it is shown to be unavailable for some reason other than the serious fault of the proponent." *Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1319 (9th Cir. 1987) (quoting *McCormick on Evidence* § 230, p. 704 (Edward Cleary ed., 3d ed. 1984)); *see also* Fed. R. Evid. 1002 ("An original writing . . . is required in order to prove its content unless these rules or a federal statute

provides otherwise."). Rule 1004(a) provides an exception where the original is lost or destroyed "and not by the proponent acting in bad faith." However, "[t]he burden of proving loss or destruction under Rule 1004 is on the proponent of the evidence," and the court must find it "more probable than not that the originals . . . were lost or destroyed without bad faith." *Seiler v. Lucasfilm, Ltd.*, 613 F. Supp. 1253, 1260, 1262 (N.D. Cal. 1984), *aff'd*, *Lucasfilm*, 808 F.2d 1316. Additionally, where, as here, "the missing original writing in dispute is the very foundation of the claim . . . more strictness of proof is required than where the writings are only involved collaterally." *Medina v. Multaler, Inc.*, No. CV0600107MMMAJWX, 2007 WL 5124009, at *5 (C.D. Cal. Feb. 7, 2007) (internal quotation marks, citation, and alterations omitted). And a "'best evidence objection is particularly appropriate where, as here, the alleged writer of the original document [(here, Defendant as the alleged signatory)] does not acknowledge the document's existence.'" *Wu v. Boeing Co.*, No. SACV 11-1039 DOC ANX, 2012 WL 3627510, at *5 (C.D. Cal. Aug. 22, 2012) (quoting *Medina*, 2007 WL 5124009, at *1).

Plaintiff claims that the consulting agreement is in CLRS's files and CLRS no longer exists, but that it attempted to locate the consulting agreement. Specifically, Lawrence Johnson, an Allergia director, "reached out" to former CLRS executives, employees at CLRS's successor companies (Solta and then Valeant Pharmaceuticals), and the attorneys who had represented Solta during the 2010 transaction—but was ultimately unsuccessful in obtaining a copy of the consulting agreement. (Def.'s MSJ Opp'n 15 (citing Johnson Decl. ¶¶ 36–40, ECF No. 96-1).)

As an initial matter, these search efforts appear remarkably insignificant considering that this consulting agreement is ostensibly Plaintiff's "smoking gun" evidence of a written assignment of patent rights.[9] *Cf. Rosenberg v. Neubeck*, No. CIV. 96-20174 SW, 1997 WL

---

[9] In so noting, the Court is mindful of Plaintiff's similar argument regarding Defendant's "loss" of his work log. (*See, e.g.*, Def.'s MSJ Opp'n 11 ("Defendant testified that he kept a manual log of his hours of Allergia work on a pad at his desk at home, but that it had disappeared. (D Dep., p. 267, l. 8-14; ECF 78). Defendant's 'loss' of such a document, so critical to his claim for 'work' for Allergia, is tantamount to

16

33014, at *3 (N.D. Cal. Jan. 15, 1997) (holding that a lawyer beeping the pager of someone believed to possess a missing document was not sufficient to constitute a diligent search for the document). Specifically, Plaintiff fails to explain why it could not locate this alleged consulting agreement using the ordinary tools of third-party discovery (which, according to the Johnson Declaration, it did not even attempt to use). *See L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 936 (9th Cir. 2002), *opinion amended and superseded*, 313 F.3d 1093 (9th Cir. 2002) (holding that the best evidence rule applies where proponent of excluded evidence "offers no basis for concluding that it could not have obtained the original [document] by ordinary third-party discovery"); *cf. Medina*, 2007 WL 5124009, at *4 (noting that party seeking to introduce evidence "could have used any and all of the mechanisms provided by the Federal Rules of Civil Procedure to seek and/or compel production" of missing document and her failure to do so "weighs against a finding that she made a reasonable and diligent search for the document").

Furthermore, there is no other documentary evidence corroborating the existence of this written consulting agreement. As Defendant explains, there is "no mention of this agreement in any of Oberreiter's emails during the relevant events," nor did Oberreiter reference the agreement "when he attempted (and failed)—on at least *four separate occasions*—to obtain [Defendant's] signature on a written assignment agreement." (Def.'s MSJ Mem. 21 (emphasis in original).) Thus, aside from self-serving testimony,[10] Plaintiff fails to offer any evidence that the supposed consulting agreement existed, let alone that it was lost during the Solta-CLRS merger or its aftermath. Such testimony is inadmissible to prove that the supposed consulting agreement existed and now is lost. *Valentine v. Cal.*

---

spoliation of evidence, or at least should be a factor weighing against Defendant in connection with the present motion and generally within this lawsuit.").)

[10] As Defendant notes, while Oberreiter is not a party to this action, he has demonstrated a willingness to assist Plaintiff in this litigation. (Def.'s MSJ Mem. 22.) Additionally, he is one of Plaintiff's largest shareholders, and was the individual who asked Defendant to execute a written assignment of his patent rights on several occasions. (*Id.*)

*Employment Dev. Dep't*, No. CV 10-8717 CAS SSX, 2012 WL 386682, at *1 n.4 (C.D. Cal. Feb. 6, 2012) ("Here, plaintiff offers her testimony to prove the letters' contents, and she fails to set forth any evidence that she sent the letters to the EEOC other than her self-serving declaration. Plaintiff's testimony is therefore inadmissible to prove the contents of the letters."); *Keshe v. CVS Pharmacy Inc.*, No. 214CV08418CASMANX, 2016 WL 1367702, at *2 n.2 (C.D. Cal. Apr. 5, 2016) (similarly holding that uncorroborated, self-serving testimony was inadmissible to prove the contents of an alleged document). Based on this evidence, the Court does not find that it is "more likely than not" that the consulting agreement existed at one point but was subsequently lost. *Seiler*, 613 F. Supp. at 1262. Consequently, the Court concludes that Plaintiff's testimonial evidence is inadmissible to prove the existence, contents, and execution of an alleged consulting agreement containing a patent assignment clause. *Orr v. Bank of Am.*, 285 F.3d 764, 733 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment." (citing Fed. R. Civ. P. 56(e))).

Finally, even if this uncorroborated, self-serving testimony were admissible to prove the existence and terms of the alleged consulting agreement, it alone would be insufficient to create a genuine issue of material fact precluding summary judgment. *See, e.g.*, *F.T.C. v. Neovi, Inc.*, 604 F.3d 1150, 1159 (9th Cir. 2010), *as amended*, No. 09-55093, 2010 WL 2365956 (9th Cir. June 15, 2010) ("Specific testimony by a single declarant can create a triable issue of fact, but the district court was correct that it need not find a genuine issue of fact if, in its determination, the particular declaration was 'uncorroborated and self-serving.' The district court was on sound footing concluding that Qchex put forward nothing more than a few bald, uncorroborated, and conclusory assertions rather than evidence." (citations omitted)). And reliance on this testimony is particularly inappropriate where, as here, not only is the existence of the document itself in dispute, but also the material terms of the assignment clause within the consulting agreement. *See, e.g.*, *Ihance, Inc. v. Eloqua Ltd.*, 2012 WL 12875516 (E.D. Va. July 3, 2012) ("[I]n the end, after considering the strength of the inventors' testimony and recollection, and the lack of any

objective evidence corroborating such testimony, iHance falls short of carrying its burden to establish that a valid written assignment of patent rights to iHance was executed in 2002/2003."). Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment on Plaintiff's Declaratory Judgment claim.[11]

Of course, there is a separate issue of whether, notwithstanding his one-third ownership, Defendant nevertheless agreed to transfer his rights to Plaintiff. That issue is separate and distinct from this discussion, and is addressed below, *infra* Section II.D.1.

### C. Breach of Fiduciary Duty

Plaintiff's second claim for relief is partially for breach of fiduciary duty, which is premised, among other actions, on Defendant's alleged preparation of "separate and competitive patent applications that have or will foreseeably negatively affect Plaintiff's opportunities to commercialize Plaintiff's invention." (SAC ¶ 52.) Plaintiff claims that Defendant prepared these patent applications while serving as an officer and/or director of Allergia. (*Id.*) Defendant moves for summary judgment on this portion of Plaintiff's breach of fiduciary duty claim. (Def.'s MSJ Mem. 23.)

"To establish a cause of action for breach of fiduciary duty, a plaintiff must demonstrate the existence of a fiduciary relationship, breach of that duty and damages." *Charnay v. Cobert*, 145 Cal. App. 4th 170, 182 (2006) (citing *Benasra v. Mitchell Silberberg & Knupp LLP*, 123 Cal. App. 4th 1179, 1183 (2004)); *Pierce v. Lyman*, 1 Cal. App. 4th 1093, 1101 (1991)). "A fiduciary relation in law is ordinarily synonymous with a confidential relation." *Rickel v. Schwinn Bicycle Co.*, 144 Cal. App. 3d 648, 654 (1983) (internal quotation marks omitted) (quoting *Bacon v. Soule*, 19 Cal. App. 428, 434 (1912)).

---

[11] Plaintiff separately moves for declaratory judgment that it "is at least the co-owner of Defendant's foregoing patent applications, and/or is authorized to practice any inventions disclosed and/or claimed in those applications (and/or any patents that may eventually issue based on same)." (SAC ¶ 47.) Defendant does not appear to address this portion of Plaintiff's declaratory judgment claim. (*See generally* Def.'s MSJ Mem.) Therefore, the Court's ruling on Defendant's Motion for Summary Judgment does not dispose of this claim at this time.

14-CV-1566 JLS (RBB)

A fiduciary relationship is "founded upon the trust and confidence reposed by one person in the integrity and fidelity of another, and likely precludes the idea of profit or advantage resulting from the dealings of the parties and the person in whom the confidence is reposed." *Id.* (quoting *Bacon*, 19 Cal. App. at 434) (internal quotation marks omitted). Inherent in this relationship "is the duty of undivided loyalty the fiduciary owes to its beneficiary . . . ." *Wolf v. Superior Court*, 107 Cal. App. 4th 25, 30 (2003). Directors and majority shareholders of corporations are ordinarily bound by fiduciary duties. *See id.* (collecting cases).

Defendant argues that he is entitled to summary judgment on this claim because (1) there is no record evidence to support this claim, and (2) the record evidence shows the opposite. (Def.'s MSJ Mem. 23.) The Court agrees with Defendant. While the Court previously found that this theory of breach of fiduciary duty was plausible, (*see* MTD Order 7–8, ECF No. 51), at this stage Plaintiff has provided no evidence that Defendant actually prepared secret patent applications while serving as its director and/or officer.[12] Nor does Plaintiff dispute Defendant's contention that the record evidence demonstrates that Defendant did not work on his patent application while affiliated with Allergia. (*See* Def.'s MSJ Mem. 23–24.) In fact, Plaintiff's Opposition to Defendant's MSJ is completely silent on this argument.[13] (*See generally* Def.'s MSJ Opp'n; *see also* Def.'s MSJ Reply 8 (noting

---

[12] Defendant argues that the Court previously held this was Plaintiff's only viable theory of breach of fiduciary duty that survived Defendant's Motion to Dismiss. (Def.'s MSJ Mem. 23 n.7 (citing MTD Order, ECF No. 51).) Defendant is wrong. Plaintiff's First Amended Complaint contained three theories of breach of fiduciary duty. (*See* MTD Order 6–7.) While Defendant moved to dismiss all three, the Court concluded that because "Plaintiff's third theory of liability is sufficient to survive Defendant's MTD, the Court address[ed] only the parties' arguments concerning those allegations." (*Id.* at 7.) Thus, the Court did not reject Plaintiff's other theories in denying Defendant's Motion to Dismiss Plaintiff's breach of fiduciary duty claim. Nevertheless, because Plaintiff fails to even mention its breach of fiduciary duty claim in its opposition—let alone discuss Defendant's arguments against that claim—and because Defendant briefly addresses these alternative theories in his Motion for Summary Judgment, (Def.'s MSJ Mem. 23 n.7), the Court **GRANTS** Defendant's Motion for Summary Judgment on these additional theories of breach of fiduciary duty as well.

[13] And at the hearing Plaintiff conceded this point and withdrew its cause of action for breach of fiduciary duty. (MSJ Hr'g Tr. 6:25–7:11.)

same).) Consequently, the Court **GRANTS** Defendant's Motion for Summary Judgment on Plaintiff's claim for breach of fiduciary duty. *See Celotex*, 477 U.S. at 323 ("The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.").

### D. Breach of Implied Contract

The other portion of Plaintiff's second claim for relief is for breach of an implied contract, which has two distinct premises: "Defendant has breached his . . . contractual (at least implied) . . . duties to Plaintiff" by (1) "fail[ing] to sign the formal documents confirming Plaintiff's ownership of the '172 and other related applications"; and (2) "preparing separate and competitive patent applications that have or will foreseeably negatively affect Plaintiff's opportunities to commercialize Plaintiff's invention." (SAC ¶ 52.)

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011) (citing *Reichert v. Gen. Ins. Co.*, 68 Cal. 2d 822, 830 (1968)). A contract may be express or implied. Cal. Civ. Code § 1619.

Defendant argues he is entitled to summary judgment on Plaintiff's breach of contract claim because (1) Plaintiff has failed to allege the existence of an implied contract to assign; (2) Plaintiff cannot establish an implied non-compete contract, which would be void under California law in any case; and (3) Plaintiff's breach of contract claim is barred by California's two-year statute of limitations. (Def.'s MSJ Mem. 25–27.) The Court considers each argument in turn.

#### 1. Implied Contract to Assign Patent Rights

As discussed above, *supra* Section II.B, Plaintiff cannot produce a written patent assignment from Defendant to CLRS, Plaintiff, or any other party. Nor has Plaintiff presented a written, executed agreement that Defendant would assign his patent rights to

Plaintiff at a future date. Thus, the Court must consider whether Plaintiff has produced any evidence of Defendant's implied agreement to assign his patent rights, and his resulting breach of that agreement, thus precluding summary judgment at this stage. The Court concludes that it has not.

"An implied contract is one, the existence and terms of which are manifested by conduct." Cal. Civ. Code § 1621. The essential difference between an implied contract and an express contract is the mode of proof. When a contract is implied, the party asserting it must show conduct from which a promise may be inferred. *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 675 (1988); *Youngman v. Nev. Irrigation Dist.*, 70 Cal. 2d 240, 246 (1969); *Chandler v. Roach*, 156 Cal. App. 2d 435, 440 (1957); *Thompson v. Cal. Brewing Co.*, 150 Cal. App. 2d 469, 473 (1957); *see also Bush v. Lane*, 161 Cal. App. 2d 278, 279 (1958) (stating that an implied contract can be inferred from "the conduct, situation, or mutual relations of the parties"); *Del E. Webb Corp. v. Structural Materials Co.*, 123 Cal. App. 3d 593, 611 (1981) ("Whether or not an implied contract has been created is determined by the acts and conduct of the parties and all the surrounding circumstances involved and is a question of fact.").

"A contract to assign a patent is legally distinguishable from an assignment of a patent . . . ." *Solomon*, 825 F.2d at 1296. "Unlike a patent assignment, an agreement to assign a patent—*i.e.* to assign a patent in the future—does not have a statutory basis and does not need to be in writing." *Sourceprose Corp. v. RPX Corp.*, No. 16-CV-04089-LB, 2017 WL 373065, at *3 (N.D. Cal. Jan. 26, 2017) (citing *Univ. Patents, Inc. v. Kligman*, 762 F. Supp. 1212, 1219 (E.D. Pa. 1991)).

Defendant first argues that Plaintiff's breach of contract claim must fail because it is based on the CLRS Assignment Agreements, contracts to which Defendant was not a party and that do not reference his individual rights to the Allergy Device. (Def.'s MSJ Mem. 25.) Plaintiff argues that when Defendant signed the CLRS Assignment Agreements on Allergia's behalf he manifested his "intent . . . that Allergia owns all of the relevant patent rights." (Def.'s MSJ Opp'n 18–19.)

The Court agrees with Defendant. As the Court previously explained, (*see* MTD Order 10, ECF No. 51), although Defendant signed the CLRS Assignment Agreements, Defendant signed those documents in his capacity as <u>president</u> of Allergia—not as an individual. (*See, e.g.*, Holland Decl. Ex. N, at 3 (signature page), ECF No. 86-16.) Thus, Defendant was not a party to either agreement, and is therefore not contractually bound by the Assignment and Assumption Agreement to "execute and deliver . . . instruments of assignment and assumption . . . ."[14] (Pl.'s SOF ¶ 51 (citing Holland Decl. Ex. N ¶ 6).)

Nor does this evidence create a genuine issue of material fact that Defendant is bound by an implied contract to assign his rights to Plaintiff. For one, as just discussed, Defendant signed the CLRS Assignment Agreements on behalf of Allergia as its president, not in his individual capacity. Additionally, Defendant had several times previously declined to assign his rights to the invention. Significantly, Defendant rebuffed Oberreiter's attempt to secure an assignment of his individual rights in the Allergy Device <u>just one week</u> before Defendant signed the CLRS Assignment Agreements as Allergia president, on which Plaintiff relies to demonstrate an implied contract to assign. (*Compare* Pl.'s SOF ¶ 41 (recounting that <u>sometime after October 1, 2010</u>, Defendant called Oberreiter and "Oberreiter encouraged Defendant to sign the assignment of documents" to no avail),[15] and *id.* ¶ 45 (recounting that on a telephone conference around <u>October 5, 2010</u> Defendant "made clear to [Oberreiter] that Defendant was not going to sign the patent assignment

---

[14] Plaintiff does not dispute this point.

[15] Paragraph 41 of Plaintiff's Statement of Undisputed Facts also states that on that call Defendant "said that Defendant was not going to sign the assignment document and indicated that Defendant thought that Defendant owned the allergy technology." But in its reply brief Plaintiff claims that it inadvertently described "testimony" of Defendant as an "undisputed fact," which it actually disputes. (Pl.'s MSJ Reply 4.) Thus, Plaintiff states that this sentence should begin with "Defendant testified that." Accordingly, the Court does not consider this disputed testimony in viewing the evidence in the light most favorable to Plaintiff. But Plaintiff's clarification does not dispute that, on that call, "Oberreiter encouraged Defendant to sign the assignment document" without success. (*See generally id.*; *see also* Oberreiter Suppl. Decl. ¶¶ 2, 3, ECF No. 102-3 (noting that he does not recall Defendant's assertion of rights but "generally . . . recall[s] the above communications with Defendant").)

14-CV-1566 JLS (RBB)

document"), *with id.* ¶ 49 (noting that Oberreiter forwarded the CLRS Assignment Agreements to Defendant on October 12, 2010 and Defendant reviewed and signed those documents as president of Allergia).) Thus, even viewing this evidence in the light most favorable to Plaintiff, this course of conduct reveals that Defendant performed his duty as Allergia president to accept an assignment of rights from CLRS to Allergia while never once ceding—in fact, consistently and recently refusing to cede—his individual rights in the Allergy Device and related intellectual property.

Plaintiff points to two other pieces of evidence that purportedly establish genuine issues of material fact.[16] (Def.'s MSJ Opp'n 19–20.) But this evidence simply highlights some inconsistencies between Plaintiff's evidence and Defendant's statement of facts. (*Id.*) Plaintiff does not explain how these inconsistencies are material to *any* of its claims—much less the implied contract claim here at issue. (*See id.* at 19 (noting inconsistencies between Defendant's statement of facts and the Johnson Declaration regarding the reasons for Defendant's removal as president in early 2011); *id.* at 20–21 (providing an email demonstrating that, despite Defendant's statements to the contrary, **Defendant's 'work' with CLRS was NOT limited to fundraising or for medical consulting on CLRS' CLARO acne device**" (emphases in original)).)

As to the latter of the two pieces of evidence, Plaintiff additionally argues that "[f]ollowing the March 19, 2008 email . . . Defendant never challenged the statements near the end of the document . . . that . . . CLRS owned the allergy 'new product' . . . ." (Def.'s MSJ Opp'n 20.) While unclear, the Court presumes Plaintiff argues that Defendant's silence implies his agreement to transfer his rights in the Allergy Device to (at that time) CLRS. There are at least two problems with this argument. First, the email Plaintiff references does not actually say that CLRS "owns" anything. Rather, the portion Plaintiff

---

[16] Plaintiff strangely argues that "[e]ven if the Court were to find that Allergia were making a claim for breach of an 'oral' agreement . . . ." (Def.'s MSJ Opp'n 18.) But the Court finds no such thing—specifically, Plaintiff has pointed to no evidence that Defendant entered into an oral agreement to assign his patent rights. To the extent the Court may "find" an oral agreement, Plaintiff must first find and present some evidence of an oral agreement between the parties. And Plaintiff has failed to do so.

references simply reads:

> We will be defining the parameters of the proposed allergy device and attempting to file provisional patents as quickly as possible. I will send out a separate and more comprehensive report on this potential new product very shortly. Dr. Bouboulis our lead on this project has Albert Einstein School of Medicine ready to do a clinical study on this novel treatment for rhinitis.

(Def.'s MSJ Opp'n 21.) There is no mention in this passage of ownership in the device or any then-nascent intellectual property in the device. Nor is there any such mention in the remainder of the email. It is simply a status update on the device that does not even mention ownership, let alone suggest that recipients must respond to the email lest they forfeit any rights in the device and upcoming provisional patent applications. Second, Plaintiff cites to no authority demonstrating that one's failure to respond to another's assertion of sole ownership of patent rights—much less, as here, an email that does not do so—somehow forms an implied contract to assign one's patent rights to the other. A failure to respond in the face of such a claim could in concert with other conduct possibly support a finding of an implied contract, or at least raise a genuine issue of material fact. But that is plainly missing here, since the relevant passage neither says nor implies any such thing.

Finally, at the outset of its opposition brief Plaintiff states that it also "relies on its own pending Motion for Summary Judgment and supporting brief" to supplement its opposition to Defendant's Motion for Summary Judgment. (Def.'s MSJ Opp'n 6.) But Plaintiff does not cite to any *specific* portion of its opening brief, which deals solely with its deficiently pled promissory estoppel claim, to support its argument that genuine issues of material fact exist on its breach of implied contract claim. (*See generally id.*) Thus, Plaintiff fails to meet its burden in opposing Defendant's Motion for Summary Judgment, and the Court may properly grant Defendant's motion on this basis. *See Celotex*, 477 U.S. at 324 ("Rule 56(e) therefore requires the nonmoving party to . . . designate 'specific facts showing that there is a genuine issue for trial.'" (emphases added)); *S. Cal. Gas Co. v. City*

*of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003) ("A party opposing summary judgment must direct our attention to specific, triable facts. General references without page or line numbers are not sufficiently specific." (citations omitted)); Fed. R. Civ. P. 56(c)(1)(A) (requiring parties to cite to "particular parts of materials in the record").

Even though the Court "is not required to comb the record to find some reason to deny a motion for summary judgment," *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988), the Court finds that Plaintiff's reliance on its opening brief is insufficient to defeat Defendant's Motion for Summary Judgment. As discussed above, *supra* Part I, Plaintiff provides a list of events to argue that Defendant's failure to assert his rights (i.e., his silence) manifested a promise that he believed Plaintiff owned all rights in the Allergy Device including its related intellectual property. (*See* Pl.'s MSJ Mem. 15–16.) Of course, as discussed these events fail to demonstrate a promise of any kind. But it is possible that Plaintiff is also relying on these events to demonstrate that a genuine issue of material fact exists that the parties entered into an implied contract that Defendant would assign his rights in the Allergy Device to Plaintiff, and that he breached that implied contract when he failed to do so.

The Court concludes that they do not. While "silence may under certain circumstances be a sufficient manifestation of acceptance to form a binding contract[,]" *People v. Randono*, 32 Cal. App. 3d 164, 177–78 (1973) (citing 1 Witkin, *Summary of Cal. Law*, Contracts, § 60, at 65–67 (7th ed. 1960)), Defendant's silence under these circumstances does not demonstrate the existence of a contract. Plaintiff might have a better case if it or its officers affirmatively told Defendant that Plaintiff exclusively owned the Allergy Device and related intellectual property and that Defendant's silence or continued work on the Allergy Device would serve as an acknowledgement of Plaintiff's ownership. But that is not what happened in any of the events Plaintiff describes.

Two of these "events" are worth addressing: (1) the unexecuted royalty agreement; and (2) Defendant's refusal to sign a formal assignment because he allegedly wanted a

larger ownership percentage of Allergia.[17] Turning to the first, Plaintiff claims that after some time working on the Allergy Device Defendant asked CLRS for more compensation for all of his work. (Pl.'s MSJ Mem. 15, ¶ 8.) In response, CLRS presented a written proposal that contained a clause stating that as between Defendant and CLRS "all patent rights, copyrights, trade secrets, trademarks and other proprietary rights concerning the [allergy technology] remain the exclusive property of CLRS, and [Defendant] would not acquire any rights therein except for the limited right to any use specified in this Agreement." (*Id.* (citing Pl.'s SUF ¶ 30); *see also* Holland Decl. Ex. E ¶ 9, ECF No. 86-7.) Defendant reviewed the proposal and continued to negotiate the royalty rate and time period provisions, but did not raise the issue of ownership of the patent rights. (*Id.* ¶ 9.) The parties never signed the agreement, but Defendant continued to assist with a patent application directed to the allergy technology. (*Id.* ¶ 10.)

Plaintiff presumably argues that the ownership provision in the proposed royalty agreement affirmatively stated that it owned the Allergy Device and related intellectual property, and that Defendant should have raised his objections to the provision at that point. It thus follows, according to Plaintiff, that Defendant's silence in the face of this clause manifests his assent to its terms. That might be true if Defendant actually signed the royalty agreement. The problem, of course, is that he did not. Without his signature, that assignment/ownership clause was merely what Plaintiff hoped to gain in exchange for granting Defendant royalties from future sales of the Allergy Device. Thus, contrary to

---

[17] The other "events" have already been addressed and/or plainly fail to demonstrate the existence of an implied contract. For instance, Plaintiff argues that Defendant should have asserted his rights in the invention when he first suggested the use of light technology to treat allergies, when CLRS/Oberreiter thereafter told Defendant that they were interested in pursuing patent protection for the idea, and when Defendant continued working on the project. (Pl.'s MSJ Mem. 15, ¶¶ 1–7.) But, as discussed, Plaintiff has presented no authority demonstrating that in this situation Defendant would have a duty to speak up, lest he be held to assent to an implied contract to assign his intellectual property rights to Plaintiff. Plaintiff also lists Defendant's signing of the Assignment Agreements as Allergia's president, which the Court has already addressed and found insufficient to create a genuine issue of material fact of the existence of an implied contract, *see supra* Section II.D.1.

Plaintiff's interpretation of events, Defendant was not "silent" on the clause—he explicitly rejected it by not signing the agreement. Far from evincing an implied contract to assign rights, this event demonstrates an explicit decision <u>not</u> to do so.

Turning to the second event, Plaintiff claims that "[m]ore than two years after he first suggested the allergy concept to CLRS, as CLRS was running into financial trouble and was negotiating to merge with a third party Solta, Defendant refused to sign a formal assignment document for filing with the U.S. Patent Office, but stated that his refusal was because he wanted a larger ownership percentage of Allergia." (Pl.'s MSJ Mem. 16, ¶ 11.) Plaintiff's reliance on this evidence is bizarre. For one, Plaintiff acknowledges that Defendant <u>refused to sign a formal assignment</u> of his rights. This alone defeats Plaintiff's argument that this evidence created an implied contract to assign; to the contrary, it evinces an explicit *rejection* of a contract to assign. Additionally, Plaintiff fails to explain why Defendant's alleged reason for refusing to sign this assignment agreement is in any way relevant. If anything, his alleged reason—that he wanted a greater ownership share in Allergia—actually belies Plaintiff's theory of an implied contract. Specifically, Defendant's reason for rejecting the deal demonstrates that Defendant knew that he had ownership rights in the intellectual property and knew that Plaintiff knew that (why else would Plaintiff try to get Defendant to assign his rights?). Defendant was willing to give up his rights for something more, but Plaintiff apparently did not offer more. So he did not.

In sum, even viewing the evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff has failed to identify specific evidence demonstrating that a genuine issue of material fact exists on its claim that Defendant breached an implied contract to assign his patent rights to Plaintiff.[18] Accordingly, the Court **GRANTS**

---

[18] To be sure, Plaintiff argues that "other extensive factual evidence, including multiple writings and other actions and investments of time and effort by all parties (including Defendant) further confirm the parties' intent for Allergia to own all of the relevant patent rights." (Def.'s MSJ Opp'n 19.) But Plaintiff does not identify any of that evidence with specificity. This is insufficient to meet its burden in response to Defendant's Motion for Summary Judgment.

28

Defendant's Motion for Summary Judgment on Plaintiff's breach of implied contract claim.[19]

### 2. Implied Non-Compete Contract

Defendant moves for summary judgment on Plaintiff's breach of contract claim to the extent it is based on a non-compete contract. (Def.'s MSJ Mem. 26.) Specifically, Defendant argues that Plaintiff has provided no evidence that Defendant entered into an agreement not to compete and that, even if it did, such a contract would be unenforceable under California law. (*Id.*) Plaintiff does not respond to Defendant's arguments. (*See generally* Def.'s MSJ Opp'n.) And Defendant is right that, with limited exceptions, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600; *Edwards v. Arthur Anderson LLP*, 44 Cal. 4th 937, 945 (2008); *see also Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1462 (2002) (rejecting the inevitable disclosure doctrine because it "creates a de facto covenant not to compete and runs counter to the strong public policy in California favoring employee mobility" codified in Section 16600 (internal quotation marks and alterations omitted)). Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment on Plaintiff's breach of contract claim to the extent it is based on a breach of a non-compete contract.

### E. Fraud

Plaintiff's third and final claim for relief is for fraud, which has two distinct premises. First, Plaintiff alleges that Defendant "committed fraud on Plaintiff Allergia by failing to expressly inform Allergia if Defendant . . . had NOT assigned his rights in the Allergia patent application/invention to Allergia." (SAC ¶ 57 (emphasis in original).) Second, Plaintiff alleges that Defendant "committed fraud on Plaintiff Allergia by failing to expressly inform Allergia that Defendant . . . had invented and/or was preparing a patent

---

[19] For this reason the Court need not reach Defendant's argument that Plaintiff's breach of contract claim is time-barred.

application and/or other action(s) to compete with Plaintiff's patent-pending technology." (*Id.* ¶ 58.)

Under California law, the elements of a cause of action for fraud are (1) misrepresentation, (2) knowledge of falsity, (3) intent to defraud, (4) plaintiff's justifiable reliance, and (5) damages. *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996). Similarly, the elements for fraud based on concealment are:

> (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.

*SCC Acquisitions Inc. v. Cent. Pac. Bank*, 207 Cal. App. 4th 859, 864 (2012) (internal quotation marks omitted) (quoting *Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC*, 162 Cal. App. 4th 858, 868 (2008)). "A duty to speak may arise in four ways: it may be directly imposed by statute or other prescriptive law; it may be voluntarily assumed by contractual undertaking; it may arise as an incident of a relationship between the defendant and the plaintiff; and it may arise as a result of other conduct by the defendant that makes it wrongful for him to remain silent." *Id.* (quoting *Blickman*, 162 Cal. App. 4th at 867) (internal quotation marks omitted).

Defendant argues that he is entitled to summary judgment on both theories of fraud. As to the first, Defendant argues that Plaintiff cannot provide any evidence that Defendant had any intent to defraud Plaintiff by concealing his "belief" that he still owned some rights in the intellectual property. (Def.'s MSJ Mem. 27.) Similarly, as to the second theory, Defendant argues that Plaintiff cannot provide any evidence that Defendant fraudulently concealed any secret preparation of his own patent, much less that such preparations occurred while Defendant was still affiliated with Allergia. (*Id.* at 28.) Plaintiff apparently

agrees, since it does not dispute either of Defendant's arguments—or even mention its fraud claim at all—in its Opposition.[20] (*See generally* Def.'s MSJ Opp'n; *see also* Def.'s MSJ Reply 8 (noting same).) Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment on Plaintiff's fraud claim.[21]

### F. Unjust Enrichment, Quantum Meruit, California Minimum Wage Laws

Defendant also moves for summary judgment on his counterclaims for unjust enrichment, quantum meruit, and violation of the California minimum wage laws. (Def.'s MSJ Mem. 29–31.)

The elements of unjust enrichment are: (1) receipt of a benefit and (2) the unjust retention of the benefit at the expense of the other. *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1594 (2008). However, "even when a person has received a benefit from another, he is required to make restitution only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it." *Ghirardo v. Antonioli*, 14 Cal. 4th 39, 51 (1996) (internal quotation marks omitted).

Similarly, "[t]o recover in quantum meruit, a party need not prove the existence of a contract, but it must show the circumstances were such that 'the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made.'" *Huskinson & Brown, LLP v. Wolf*, 32 Cal. 4th 453, 458 (2004) (citations omitted).

Under California Labor Code section 1194(a), "[n]otwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the

---

[20] At the hearing, Plaintiff urged the Court to consider the general course of conduct between the parties as evidence of Defendant's alleged fraud. (MSJ Hr'g Tr. 8:18–9:6, 12:19–15:22.) But, as with its moving papers, Plaintiff failed to engage with the specific elements of a cause of action for fraud, such as providing any evidence of Defendant's intent to defraud Allergia, or that Allergia justifiably relied on Defendant's conduct. Much more is needed at the summary judgment phase.

[21] For this reason the Court need not reach Defendant's additional arguments against Plaintiff's fraud claim.

legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit." *See also* Cal. Lab. Code § 1197.1. In other words, California "employees have a non-waivable, non-negotiable right to compensation for all hours worked." *Munoz v. Atl. Express of L.A., Inc.*, No. CV 12-6074-GHK FMOX, 2012 WL 5349408, at *4 (C.D. Cal. Oct. 30, 2012) (citing Cal. Lab. Code § 1194(a)).

The premise underlying these three counterclaims is that Plaintiff failed to pay Defendant anything for his work while he served as president of Allergia. (*Id.*) Defendant acknowledges that there is an "executive exemption" to California's minimum wage laws. (Def.'s MSJ Mem. 31.) But in order to qualify for that exemption an employee must, among other things, "earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment." *See* Cal. Code Regs. tit. 8, § 11040. Such an exemption is inapplicable here because Plaintiff did not pay Defendant at all, much less a monthly salary twice the amount of minimum wage for full-time employment.

Plaintiff devotes the bulk of its opposition to Defendant's Motion for Summary Judgment addressing this nonpayment issue. (*See generally* Def.'s MSJ Opp'n.) But Plaintiff does not directly address Defendant's counterclaims for unjust enrichment or quantum meruit. Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment as to those counterclaims.[22] However, Plaintiff does address Defendant's counterclaim that Plaintiff violated California minimum wage laws by not paying Defendant during his work for Allergia. Specifically, Plaintiff argues that (1) Defendant was not an "employee" because he was an officer who performed "minor services" as

---

[22] In addition, as discussed below, while Plaintiff disputes the value of Defendant's work as president of Allergia, (Def.'s MSJ Opp'n 10–14), it does not dispute that Defendant actually performed services for the company without any compensation. Thus, while genuine disputes remain regarding the value of Defendant's work, there is no dispute that Defendant did, in fact, perform uncompensated work for Plaintiff. Accordingly, Defendant is entitled to recover the value of that work—whatever it is—pursuant to a theory of unjust enrichment or quantum meruit.

understood by the Internal Revenue Service ("IRS"); (2) the Federal "de minimis" doctrine of employment law indicates that Defendant was not an Allergia "employee"; and (3) at the very least genuine disputes of material fact exist precluding a grant of summary judgment on these counterclaims. (*Id.*) The Court considers each argument in turn.

### 1. *"Employee" as Defined by the IRS*

To argue that Defendant is not an employee under California law, Plaintiff cites to a portion of a January 2017 bulletin from IRS.gov to argue that Defendant is not entitled to any compensation for his work as president of Allergia. (Def.'s MSJ Opp'n 7.) Specifically, the bulletin states that "an officer who performs no services or only minor services, and neither receives nor is entitled to receive any pay, isn't considered an employee. A director of a corporation isn't an employee with respect to services performed as a director." (*Id.*) Plaintiff argues that Defendant only performed minor services and thus is not an employee "according to the U.S. government." (*Id.* at 7–8.)

Plaintiff's argument fails. When applying section 1194 of the California Labor Code, the terms "employ," "employee," and "employment" are defined by the applicable wage order of the Industrial Welfare Commission ("IWC"). *Martinez v. Combs*, 49 Cal. 4th 35, 52 (2010), *as modified* (June 9, 2010) ("An examination of section 1194 in its statutory and historical context shows unmistakably that the Legislature intended the IWC's wage orders to define the employment relationship in actions under the statute."). "To employ, then, under the IWC's definition, has three alternative definitions. It means: (a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." *Id.* at 64 (emphasis in original); *see also* Cal. Code Regs. tit. 8, §11040, subd. 2 (providing definitions for Wage Order regulating wages, hours, and working conditions in professional, technical, clerical, mechanical, and similar occupations). Thus, whether Defendant was an "employee" for federal tax purposes as defined by the IRS is irrelevant because "[i]n no sense is the IWC's definition of the term 'employ' based on federal law." *Id.* at 66.

Here, there is no question that Plaintiff engaged or at least permitted Defendant to work as its president because a "proprietor who knows that persons are working in his or her business without having been formally hired, or while being paid less than the minimum wage, clearly suffers or permits that work by failing to prevent it, while having the power to do so." *Martinez*, 49 Cal. 4th at 69. Plaintiff admits that, even though it did not formally hire him, its board of directors elected Defendant as its president and that Defendant performed work for Allergia. (*See* Def.'s MSJ Opp'n 11 ("Defendant's work during [his presidency] involved the following three activities: [1] multiple communications with CLRS' Richard Oberreiter[;] [2] time spent on Allergia's FDA application, which involved communications with Maureen O'Connell[;] [and] [3] reviewing prior art and doing weekly studies relating to the Allergia technology.").) While Plaintiff disputes the value and significance of Defendant's work, (Def.'s MSJ Opp'n 10–14), that argument is directed to potential damages, not whether Defendant was, in fact, an employee under California law. Accordingly, Plaintiff's reliance on the IRS's definition of "employee" is inapplicable to Defendant's status as an employee for purposes of California wage laws.

### 2. The De Minimis *Doctrine*

Plaintiff further argues that even if Defendant was found to be an employee of Allergia, Defendant would not be entitled to any compensation (even minimum wage) under the federal *de minimis* doctrine. (Def.'s MSJ Opp'n 8.)

This argument fails for several reasons. First, this argument does not rebut Defendant's contention that he was an employee of Allergia. In other words, even if the time Defendant spent working for Plaintiff was *de minimis*, Plaintiff does not dispute that Defendant, in fact, worked for Plaintiff as its president. To the contrary, by disputing the amount and significance of Defendant's work for Allergia, (Def.'s MSJ Opp'n 9–14), Plaintiff acknowledges that Defendant performed work for Allergia. Thus, Plaintiff's argument lends itself to a damages determination, not a determination of liability under California wage laws.

Second, "this is a federal doctrine, and '[i]t is not clear that the *de minimis* rule applies under California law.'" *Greer v. Dick's Sporting Goods, Inc.*, No. 215CV01063KJMCKD, 2017 WL 1354568, at \*7 (E.D. Cal. Apr. 13, 2017) (quoting *Stiller v. Costco Wholesale Corp.*, 298 F.R.D. 611, 626 n.7 (S.D. Cal. 2014) (citation omitted)). Indeed, "[a]lthough the Ninth Circuit has applied the federal doctrine to state law claims, the Circuit recently certified the question to the California Supreme Court due to recent developments in state law." *Id.* (comparing *Gillings v. Time Warner Cable LLC*, 583 Fed. App'x 712, 714 (9th Cir. 2014) (applying the *de minimis* rule to California labor law claims), with *Troester v. Starbucks Corp.*, 14-55530, 2016 WL 8347245 (9th Cir. June 2, 2016) (recognizing a different outcome may be warranted under *Mendiola v. CPS Sec. Sols., Inc.*, 60 Cal. 4th 833, 842–43 (2015) and certifying the question to the California Supreme Court)).

Third, it is not clear that the *de minimis* doctrine supports Plaintiff's argument. In particular, the *de minimis* doctrine concerns the <u>temporal</u> aspect of an employee's work, not, as Plaintiff appears to argue, its value or significance. Specifically,

> [w]hen the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved.

*Lindow v. United States*, 738 F.2d 1057, 1062 (9th Cir. 1984) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946)). As the Ninth Circuit explained, the "*de minimis* rule is concerned with the practical administrative difficulty of recording <u>small amounts of time for payroll purposes</u>." *Id.* (emphasis added) (citing 29 C.F.R. § 785.47); *see also* 29 C.F.R. § 785.47 (noting that the *de minimis* rule applies "only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and

35

where the failure to count such time is due to considerations justified by industrial realities"). Indeed, as articulated by the Ninth Circuit, to determine "whether otherwise compensable <u>time</u> is *de minimis*, we will consider (1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." *Lindow*, 738 F.2d at 1063 (emphasis added). Plaintiff does not claim that Defendant's work consisted of periods of time of only a few seconds or minutes. Rather, based on Plaintiff's proffered evidence, it appears that at least some of Defendant's work required more than mere seconds or minutes (e.g., Defendant's work on the FDA application, as well as his review of prior art and weekly studies). (*See* Def.'s MSJ Opp'n 11.) Thus, while Plaintiff's evidence certainly creates genuine issues of material fact concerning the quality and quantity of Defendant's work for total compensation purposes, that same evidence demonstrates that Defendant (1) in fact worked for Plaintiff and (2) some of that work was beyond "a few seconds or minutes duration." Accordingly, Plaintiff's reliance on the federal *de minimis* doctrine does not preclude summary judgment in favor of Defendant on his California wage claim.

### 3. *Genuine Disputes of Material Fact*

Finally, Plaintiff argues that, at the very least, genuine disputes of material fact exist regarding whether Defendant was an "employee" under California law, and thus whether Plaintiff violated California wage laws by failing to pay him at least minimum wage for his services as its president. (Def.'s MSJ Opp'n 9.) For the reasons discussed above, the Court disagrees. Specifically, neither of the above two arguments refute Defendant's counterclaim that he is an employee and entitled to minimum wage under <u>California</u> law. Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment on his counterclaim that Plaintiff violated California employment laws by failing to pay him minimum wage for his services as Allergia president. This includes an award of reasonable attorneys' fees to Defendant, since an award of reasonable attorneys' fees is mandatory in a successful suit to recover unpaid wages. Cal. Lab. Code § 1194(a) (noting that an employee "is entitled to recover . . . reasonable attorney's fees"). However, genuine issues

14-CV-1566 JLS (RBB)

of material fact remain regarding the extent of Defendant's services, so a short damages trial will be necessary to determine Defendant's total amount of compensation.[23]

## CONCLUSION

For the reasons stated above, the Court **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion for Summary Judgment.

**IT IS SO ORDERED.**

Dated:  June 13, 2017

Hon. Janis L. Sammartino
United States District Judge

---

[23] This includes Defendant's claim that he is also entitled to liquidated damages and civil penalties under California labor laws, (Def.'s MSJ Mem. 31). *See* Cal. Lab. Code § 1194.2(b) (providing exception to a liquidated damages award where the court, in its discretion, finds that the "employer had reasonable grounds for believing that the act or omission was not a violation of any provision of the Labor Code relating to minimum wage"); *id.* § 1197.1(a)(1) (providing for civil penalties where violations of the labor code were intentionally committed). The Court finds that genuine issues of material fact remain regarding whether Plaintiff had a "reasonable" reason for failing to pay Defendant minimum wage, and whether such a failure was intentional.

14-CV-1566 JLS (RBB)